# FILED

2010 JUN -4 P 4: 58

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA, THE
STATE OF TENNESSEE, THE STATE
OF GEORGIA and THE STATE OF
FLORIDA ex rel. Thomas Bingham,

        Plaintiffs,

vs.

HCA, Inc.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No: 1:08-CV-71 Collier/Lee

**FILED UNDER SEAL**

## SECOND AMENDED COMPLAINT

*Qui tam* Plaintiff Thomas Bingham ("Bingham"), by and through his attorneys, pursuant
to Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure, brings this Second Amended
Complaint on behalf of the United States, the State of Tennessee, the State of Florida and the
State of Georgia and on his own behalf, pursuant to 31 U.S.C. §3730 of the Federal False Claims
Act, § 71-5-183 of the Tennessee Medicaid False Claims Act, the Florida False Claims Act, Fla.
Stat. Ann. §68.081 *et seq.* and § 49-4-168.2 of the Georgia False Medicaid Claims Act, as
follows:

## I.

## JURISDICTION AND VENUE

1.    This is an action for civil damages and penalties under the False Claims Act, 31
U.S.C. § 3729 *et seq.*("FCA"), the Tennessee Medicaid False Claims Act, § 71-5-181 *et seq.*
("TMFCA"), the Florida False Claims Act, Fla. Stat. Ann. §68.081 *et seq.* ("FFCA") and the

-1-

Georgia False Medicaid Claims Act, § 49-4-168 *et seq.* ("GFMCA"). This court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and (b) and supplemental jurisdiction pursuant to 28 U.S.C. § 1359. The court has personal jurisdiction over the defendant because the defendant transacts business and can be found in this district and the defendant committed acts within this district that violate 31 U.S.C. § 3729 as alleged herein.

2. Venue is proper in this district under 31 U.S.C. § 3732(a) because the defendant can be found and transacts business in this district.

## II.

## PARTIES

3. *Qui Tam* Plaintiff Thomas Bingham is a Certified General Real Estate Appraiser in the State of Tennessee, Tennessee Certification No. 229. Bingham resides in Nashville, Tennessee. Bingham has been employed by Holladay Properties since September 2005. Through the end of 2007, most of Bingham's workload has consisted of conducting market rent/Fair Market Value ("FMV") studies.

4. Defendant HCA, Inc.("HCA"), is a Delaware Corporation with its principal executive offices located at One Park Plaza, Nashville, Tennessee 37203. HCA is one of the leading health care services companies in the United States. Through its Tri Star Health System, which it owns and operates, HCA provides designated health services through Parkridge Medical Center ("PMC"), a 275 bed hospital located at 2333 McCallie Ave., Chattanooga, Tennessee; Summit Medical Center ("SMC"), a 188 bed hospital located at 5655 Frist Boulevard, Hermitage, Tennessee; Greenview Regional Hospital ("GRH"), a 211 bed hospital located at 1801 Ashley Circle, Bowling Green, Kentucky; and Hendersonville Medical Center ("HMC"), a 110 bed hospital located at 355 New Shackle Island Road, Hendersonville, Tennessee. HCA also owns and operates the Largo Medical Center ("LMC"), a 456-bed acute care hospital located on two campuses in Largo, Florida. PMC operates two remote facilities, the Parkridge East Hospital and Parkridge Valley, a behavioral health facility. HCA Physician Services, Inc., ("HCAPS"), HCA Realty, Inc., ("HCAR") and HCA Health Services of Tennessee, Inc., ("HCAHST") are separately incorporated, but wholly owned and operated by

-2-

HCA. Bingham is informed and believes and herein alleges that LMC, Tri-Star Health System, PMC, SMC, GRH, HMC, HCAPS, HCAR and HCAHST are mere instrumentalities of HCA. The claims made against HCA as alleged herein are made against HCA and its instrumentalities.

## III.

## THE LAW

### The False Claims Act

5.     The FCA prohibits the reckless, deliberately ignorant, or intentional submission of false or fraudulent claims and false statements in order to obtain or keep Federal money. It provides, in pertinent part:

(1) Any person who (A) knowingly presents, or causes to be presented, to an officer, agent, contractor or employee of the United States Government of the United States a false or fraudulent claim for payment or approval; or (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

\* \* \*

is liable to the United States Government . . . .

31 U.S.C. § 3729(a).

6.     The FCA defines "knowingly" as follows:

(1) the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information-- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b). Both the Tennessee Medicaid False Claims Act, the Georgia Medicaid

-3-

False Claims Act and the Florida False Claims Act are modeled after the FCA.

## The Anti-Kickback Statute

7.   The AKS, 42 U.S.C. § 1320a-7b(b), prohibits, among other things, paying kickbacks to induce referrals for services paid under federal healthcare programs. The AKS arose out of Congressional concern that payoffs to those who can influence healthcare decisions corrupt professional healthcare decision-making and may result in federal funds being diverted to pay for goods or services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. The AKS prohibits payment of kickbacks in order to protect the integrity of the Medicare program from these difficult to detect harms. First enacted in 1972, the AKS was strengthened in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions do not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

8.   The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical items and services, including items and services provided under the Medicare program. In pertinent part, the statute states:

> (b) Illegal remuneration

> \* \* \*

> > (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-

> > (A) to refer an individual to a person for the furnishing or

-4-

arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7(a)(7).

## The Stark Statute

9. 42 U.S.C. § 1395nn (commonly known as the "Stark Statute" or "Stark II) prohibits hospitals and certain other entities providing healthcare items and services from submitting Medicare claims for payment for items and services that are the product of patient referrals from physicians having an impermissible "financial arrangement" (as defined in the statute) with the hospital. The Stark Statute requires that the Medicare program deny payment for claims for any service billed in violation of its provisions. 42 U.S.C. § 1395nn(g). In addition, it requires that providers who have collected Medicare payments for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353. The Stark Statute establishes the presumptive rule that providers may not bill and the Medicare program will not pay for designated health services (as defined in the statute) generated by a referral from a physician with whom the provider has a financial relationship. 42 U.S.C. §§ 1395nn(a)(1),(g)(1). The Statute was designed to protect the federal healthcare

-5-

programs from paying for the costs of questionable utilization of services by removing monetary influences on referral decisions.

10. At all times relevant to this Complaint, the Stark Statute has applied to payments to referring physicians by hospitals and the resulting claims to the Medicare program. *See* 42 U.S.C. §§ 1395nn(h)(6)(K). In pertinent part, the Stark Statute provides:

> (a) Prohibition of certain referrals
>
> (1) In general
>
> Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then–
>
> > (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
> >
> > (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. §§ 1395nn.

11. The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. 42 U.S.C. § 1395nn(a)(2). The statute's exceptions then identify specific transactions that will not trigger its referral, billing, and payment prohibitions. 42 U.S.C. § 1395nn(b). It prohibits hospitals from billing the

-6-

Medicare program for home health services referred by a physician with whom the hospital has a financial relationship, unless an express statutory or regulatory exception for the financial relationship applies. *See* 42 U.S.C. §§ 1395nn(a),(b). Most of the exceptions under the Stark Statute parallel the regulatory and statutory exceptions to the AKS. *See* 42 C.F.R. § 1001.952.

12. For example, compensation paid to a referring physician for the rental of office space will fall within an exception to the statute if, among other things: (1) the lease is set out in writing, signed by the parties, and specifies the premises covered by the lease; (2) the space rented or leased does not exceed that which is reasonable and necessary for the legitimate business purposes of the lease or rental and is used exclusively by the lessee; (3) the rental charges over the term of the lease are set in advance, are consistent with fair market value("FMV"), and are not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties; and (4) the lease would be commercially reasonable even if no referrals were made between the parties. Additionally, compensation paid to a referring physician who has a bona fide employment relationship with the employer for the provision of services will fall within an exception to the statute if, among other things: (1) the amount of the remuneration under the employment is consistent with fair market value of the services, and is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician; and (2) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer.

13. In January 2001, HCA entered into a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services as part of a settlement of certain proceedings against HCA which alleged that HCA had provided compensation to referring physicians in violation of the Anti-Kickback Statute and the Stark Statute. The agreement, which expired on January 24, 2009, was designed, in part, to raise awareness of these laws and various regulatory issues among HCA employees and provided that further violations of these laws applicable to space lease transactions between HCA hospitals and healthcare providers could result in civil monetary penalties and criminal liability, including substantial fines and penalties. The allegations in this Complaint demonstrate that HCA has not

-7-

ended the practices that led to the proceedings culminating in the Corporate Integrity Agreement. Rather, HCA has simply devised circuitous means and unduly complex real estate transactions to conceal its continuing violations of the Anti-Kickback Statute and the Stark Statute.

## IV.

## FIRST CLAIM FOR VIOLATION OF THE FCA

## (31 U.S.C. §§ 3729(a)(1)(A) & (B)) AGAINST HCA

14. Plaintiffs repeat and reallege paragraphs 1 through 13 as if fully set forth herein.

15. Parkridge Medical Center, an HCA hospital, treats a large number of patients covered by Medicaid, Medicare, TriCare and other federally sponsored health care programs. By virtue of the terms of HCA's Corporate Integrity Agreement and federal law, at all times herein alleged, PMC knew that it was not permitted to submit claims for payment to Medicare, Medicaid or other federally sponsored health care program for services provided to any patient that had been referred by a physician with whom HCA had a financial relationship which did not fall under an exception under the Stark Statute and AKS. Yet, beginning in approximately July 2007, HCA provided, and caused others to provide, unlawful remuneration to several physicians who were members of a multi-specialty partnership in order to obtain patient referrals; disguised this illegal remuneration as legitimate payments under real estate leasing arrangements and as an assignment of an existing real estate lease; knowingly solicited and relied on an erroneous real estate market rent / FMV appraisal; and submitted, and caused others to submit, to the federally sponsored health care programs, including Medicare and Medicaid, false or fraudulent claims for reimbursement and records in support of such claims for the services PMC rendered to the beneficiaries of such federally sponsored health care programs who were referred to PMC by members of the physician partnership who were receiving compensation from HCA and its instrumentalities in violation of the Stark Statute and the AKS.

16. HCA partially owns Diagnostic Plaza IV ("Plaza IV), a medical office building which makes up one of four on-campus, medical office buildings at the Parkridge Medical Center in Chattanooga. The remaining portion of Plaza IV is owned by Diagnostics Associates of

-8-

Chattanooga ("DAC"), a Tennessee general partnership of physicians who practice in various specialties. According to the Office of the Assessor for Hamilton County, Tennessee, Plaza IV is a medical office condominium comprised of 12 condominium units totaling 86,810 usable square feet ("usf"), of which PMC (HCA) owns 45,252 usf and DAC owns 41,558 usf.

17. In addition to partial ownership of the Plaza IV medical office building, DAC's partners have also operated a multi-specialty group practice. In February 1998, DAC's partners moved the group practice to the Plaza IV building, adjacent to Parkridge Hospital. At the beginning of 2007, DAC's multi-specialty group practice consisted of at least 20 physicians. In approximately July, 2007, DAC's group practice was acquired by HCA Physician Services (HCAPS) as part of a broader compensation arrangement between DAC and HCA. HCAPS named the new group practice, Chattanooga Diagnostic Associates, LLC ("CDA"). CDA is now comprised of 13 physicians. Several DAC partners, including Thomas Mullady, Eugene Ryan and Daniel Harnsberger, are now CDA employees and refer patients to PMC. All of DAC's physician partners, however, are believed to refer patients to PMC.

18. Concurrent with HCAPS acquisition of DAC's group practice, HCA/PMC, agreed to lease Plaza IV office space from DAC. The leasing arrangement, which was entered into on July 31, 2007, provided that DAC would lease 29,204 usf to HCA/PMC at a rental rate of $12.59 per usf, absolute net, for five years. From the 29,204 usf it had leased from DAC, on or about the same date HCA/PMC subleased 22,175 usf to its wholly owned entity, CDA, at the same terms.

19. The lease rate of $12.59 per usf net agreed to between DAC and HCA/PMC was excessive and inconsistent with fair market value as defined by the Stark and AKS Statutes and regulations. HCA knew that the rental rate was excessive. In early 2007, Bingham, who was employed by an outside property management service company then on contract with HCA, had prepared a comprehensive market rent study which included standard business lease terms for Plaza IV. Bingham's market rent study, which was approved and signed in March 2007 by Darrel Moore, PMC's CEO, and Jared Webb, the Assistant Asset Manager for HCA Corporate Real Estate, determined that an equivalent net rental rate of approximately $8.10 to $10.10 per usf represented fair market value.

20. HCA agreed to pay DAC the excessive rental rate because DAC's physician

-9-

partners needed the extra money to satisfy several bank loans that had gone into default. In order to falsely justify the reasonableness of the higher lease rate, in May 2007, HCA obtained an erroneous fair market value study for Plaza IV from an unlicensed and uncertified appraiser and "split (some of) the difference" with Bingham's fair market value study arriving at a high enough rental rate for DAC's partners to meet their loan payment obligations.

21. In addition to agreeing to pay DAC a commercially unreasonable and excessive rental rate for the DAC partners' Plaza IV property, on July 31, 2007, the same day that the HCA/DAC lease agreement was signed, HCA, through its wholly owned subsidiaries, HCAR and HCAPS, engineered an assignment of DAC's 15 year lease of 32,286 usf of HCA owned property in Plaza IV, which was set to expire in 2013, from DAC to CDA, an HCAPS entity, which completely and forever released DAC from its rental payment obligations under the lease. Ostensibly, the assignment of the lease was designed to provide office space in Plaza IV for the new entity, CDA. In reality, however, the assignment of 32,286 usf from DAC to CDA constituted more disguised unlawful remuneration for DAC's partners. It did not constitute a *quid pro quo* that one would expect in an arm's length transaction between two entities bargaining for reasonable consideration. It was not commercially reasonable. The assignment included far more usf than was reasonable and necessary for CDA's group practice. Approximately 22,380 usf of the assigned 32,286 usf remains vacant and unused. Moreover, instead of a termination of the DAC lease which would have resulted in a significant termination penalty and required the creation of a new lease between HCA and CDA/HCAPS, the assignment of the lease permitted CDA, a new referral source for HCA/PMC to assume the lease at a rental rate below FMV.

22. As a further part of its unlawful compensation scheme to induce and reward a continuous stream and high volume of patient referrals to HCA/PMC from the DAC partners who became employees of CDA, HCA/PMC's lease of 29,204 usf from DAC contained a provision that permitted HCA/PMC to be released from the lease, in whole or in part, in the event that the number of physicians employed by CDA dropped to nine or less. Section 24.16 of the July 31, 2007, lease, stated the following: "[I]n the event that at any time during the Term the total number of physicians employed by Tenant or an affiliate of Tenant and practicing medicine

-10-

in the Premises decreases to nine or fewer, the Tenant may elect to be released from the Lease with respect to a portion of the Premises, provided that the percentage of the premises released shall not exceed the percentage decrease in the number of physicians."

23. Since at least July 2007, the DAC physician partners to whom the defendant provided illegal remuneration and with whom the defendant entered into illegal financial relationships have referred large volumes of patients with health care coverage from Medicare, TriCare, Medicaid and other federally sponsored health care programs to HCA/PMC. HCA/PMC, in turn, has submitted and caused to be submitted claims for payment to the federally sponsored health care programs, including Medicare, in the hundreds of thousands, if not millions, of dollars for services provided to these referred patients. These claims included HCFA Form - 1450s or their electronic equivalent. The defendant, HCA, through PMC, presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent. Under the FCA, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent because defendant HCA was not entitled to be paid for them. The defendant was not entitled to be paid for these claims because (a) it was ineligible for reimbursement under the Stark Statute's express prohibition on Medicare billing and Medicare reimbursement for services that are the product of a referral from a physician with whom HCA has an illegal financial relationship and (b) HCA forfeited the right to bill the government healthcare programs for items and services by paying remuneration to physicians intending that remuneration to induce patient referrals in violation of the AKS.

24. In addition to the knowing submission of false claims in violation of the FCA, the defendant has also knowingly made, used, or caused to be made or used, false records or statements (i.e. the erroneous market value appraisal; and the false certifications and representations on the HCFA Form 1450s or their electronic equivalents) to get false or fraudulent claims paid or approved by the United States in violation of the FCA.

25. By virtue of the false or fraudulent claims knowingly made, used, or caused to be made or used by the defendant and the false records or false statements knowingly made or caused to be made by the defendant to get such false claims paid or approved, the United States has suffered damages and therefore is entitled to statutory damages under the False Claims Act,

-11-

to be determined at trial, plus a civil penalty for each violation.

## V.

# SECOND CLAIM FOR VIOLATION OF THE TENNESSEE
# MEDICAID FALSE CLAIMS ACT AGAINST HCA

26.     Plaintiffs repeat and reallege paragraphs 1 through 25 as if fully set forth herein.

27.     Since at least July 2007, the DAC physician partners to whom the defendant provided illegal remuneration and with whom the defendant entered into illegal financial relationships have referred large volumes of patients with health care coverage from Tennessee Medicaid to HCA/PMC. HCA/PMC, in turn, has submitted and caused to be submitted claims for payment to the Tennessee Medicaid program in the hundreds of thousands, if not millions, of dollars for services provided to these referred patients.

28.     The defendant, HCA, through PMC, presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent. Under the Tennessee Medicaid False Claims Act, § 71-5-182, such claims were false and/or fraudulent because defendant HCA was not entitled to be paid for them. The defendant was not entitled to be paid for these claims because HCA forfeited the right to bill any federally sponsored state Medicaid program for items and services by paying unlawful remuneration to physicians intending that remuneration to induce patient referrals in violation of the AKS.

29.     In addition to the knowing submission of false claims in violation of the TMFCA, the defendant has also knowingly made, used, or caused to be made or used, false records or statements (i.e. the erroneous market value appraisal; and false certifications and representations on Medicaid claim forms or their electronic equivalents) to get false or fraudulent Medicaid claims paid or approved in violation of the TMFCA.

30.     By virtue of the false or fraudulent claims knowingly made, used, or caused to be made or used by the defendant and the false records or false statements knowingly made or caused to be made by the defendant to get such false claims paid or approved, the State of Tennessee has suffered damages and therefore is entitled to statutory damages under the

-12-

TMFCA, to be determined at trial, plus a civil penalty for each violation.

## VI.

## THIRD CLAIM FOR VIOLATION OF THE GEORGIA
## FALSE MEDICAID CLAIMS ACT

31.     Plaintiffs repeat and reallege paragraphs 1 through 30 as if fully set forth herein.

32.     Since at least July 2007, the DAC physician partners to whom the defendant
provided illegal remuneration and with whom the defendant entered into illegal financial
relationships have referred large volumes of patients with health care coverage from Georgia
Medicaid to HCA/PMC. HCA/PMC, in turn, has submitted and caused to be submitted claims
for payment to the Georgia Medicaid program in the hundreds of thousands, if not millions, of
dollars for services provided to these referred patients.

33.     The defendant, HCA, through PMC, presented or caused to be presented these
claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that
such claims were false and fraudulent. Under the Georgia False Medicaid Claims Act, § 49-4-
168.1, such claims were false and/or fraudulent because defendant HCA was not entitled to be
paid for them. The defendant was not entitled to be paid for these claims because HCA forfeited
the right to bill any federally sponsored state Medicaid program for items and services by paying
unlawful remuneration to physicians intending that remuneration to induce patient referrals in
violation of the AKS.

34.     In addition to the knowing submission of false claims in violation of the
GFMCA, the defendant has also knowingly made, used, or caused to be made or used, false
records or statements (i.e. the erroneous market value appraisal; and false certifications and
representations on Medicaid claim forms or their electronic equivalents) to get false or fraudulent
Medicaid claims paid or approved in violation of the GFMCA.

35.     By virtue of the false or fraudulent claims knowingly made, used, or caused to be
made or used by the defendant and the false records or false statements knowingly made or
caused to be made by the defendant to get such false claims paid or approved, the State of
Georgia has suffered damages and therefore is entitled to statutory damages under the GFMCA,

-13-

to be determined at trial, plus a civil penalty for each violation.

## VII.

## FOURTH CLAIM FOR VIOLATION OF THE FCA
## (31 U.S.C. §§ 3729(a)(1)(A) & (B)) AGAINST HCA

36.     Plaintiffs repeat and reallege paragraphs 1 through 13 as if fully set forth herein.

37.     SMC, GRH and HMC, HCA hospitals, treat large numbers of patients covered
by Medicaid, Medicare, TriCare and other federally sponsored health care programs. By virtue of
the terms of HCA's Corporate Integrity Agreement and federal law, at all times herein alleged,
SMC, GRH and HMC knew that they were not permitted to submit claims for payment to
Medicare, Medicaid, TriCare or other federally sponsored health care program for services
provided to any patient that had been referred by a physician with whom HCA had a financial
relationship which did not fall under an exception under the Stark Statute and AKS. Yet,
beginning in approximately January 2008, HCA provided, and caused others to provide, unlawful
remuneration to physicians and surgeons in private practice who were not employed by HCA or
any of its various instrumentalities in order to obtain patient referrals; disguised this unlawful
remuneration in the form of real estate leasing arrangements that were neither consistent with fair
market value in an arms length transaction nor commercially reasonable even if no referrals were
made between the physicians and surgeons. As a result, HCA and its instrumentalities submitted,
and caused others to submit, to the federally sponsored health care programs, including
Medicare, TriCare and Medicaid, false or fraudulent claims for reimbursement and records in
support of such claims for the services SMC, GRH and HMC rendered to the beneficiaries of
such federally sponsored health care programs who had been referred to SMC, GRH and HMC
by the physicians and surgeons who were receiving compensation from HCA and its
instrumentalities in violation of the Stark Statute and the AKS.

38.     HCP, Inc., ("HCP") a real estate investment trust not related to HCA, owns
Summit Medical Office Building III ("Summit MOB III"), a five story medical office building
located next to SMC in Hermitage, Tennessee. The first three levels of Summit MOB III were
constructed in 1999 and consist of 74,341 rentable square feet that were approximately 96%

-14-

occupied as of January 2008. The fourth and fifth levels of Summit MOB III, consisting of 35,142 rentable square feet, were constructed in 2005 and 2006 and were master leased by HCP to HCAHST in September 2006 for a lease term of 12 years and 15 days.

39. The terms of the master lease of the fourth and fifth levels of Summit MOB III from HCP to HCAHST provided for the rental of shell (unfinished) space at the rate of $11.55 per rentable square foot (RSF), net, $16.80 RSF, net, for finished space (an equivalent full service lease rate would be approximately $25.10 per rentable square foot), annual CPI increases and a tenant improvement build out allowance of $51 per usable square foot for shell space as HCAHST occupies or subleases space with an increase by $5 per usable square foot for ten or 15 year leases. The master lease terms agreed to between HCP and HCAHST were commercially reasonable and consistent with fair market value and comparable lease rates for similar properties in the same geographical vicinity.

40. In or about January 2008, HCAHST subleased approximately 1,700 rentable square feet on the fourth level of Summit MOB III to Dr. Christopher Taleghani, a neurosurgeon who is a patient referral source for SMC and GRH. The lease, believed to be for a term longer than one year, provided for a lease rate of $11.75 per rentable square foot net, far below the lease rate that HCAHST paid to HCP for the master lease, and a tenant improvement build-out exceeding $90 per usable square foot, far more than the tenant improvement allowance in the master lease between HCP and HCAHST. The sublease terms that HCAHST gave to Dr. Taleghani were not commercially reasonable, even if no referrals were made by Dr. Taleghani to SMC and GRH, they were inconsistent with fair market value in an arms length transaction and they violated HCA's own internal policy that no master lease rate should exceed the sublease rental rate.

41. In or about December 2008, HCAHST subleased approximately 3,135 rentable square feet on the fifth level of Summit MOB III to Dr. John Boskind, Dr. Michael Thomas and Dr. Alex Fruin, d.b.a. The Surgical Clinic, general surgeons who are patient referral sources for SMC and HMC. The lease, believed to be for a term longer than one year, provided for a lease rate of $18.50 per rentable square foot, gross, far below the lease rate that HCAHST paid to HCP for the master lease (based on the equivalent full service or gross rate), and a tenant

-15-

improvement allowance of $90.00 per usable square foot, far more than the tenant improvement allowance in the master lease between HCP and HCAHST. The sublease terms that HCAHST gave to Drs. Boskind, Thomas and Fruin were not commercially reasonable, even if no referrals were made by Drs. Boskind, Thomas and Fruin to SMC and HMC, they were inconsistent with fair market value in an arms length transaction and they violated HCA's own internal policy that no master lease rate should exceed the sublease rental rate.

42.    Since at least January 2008, Drs. Taleghani, Boskind, Thomas and Fruin, to whom the defendant has provided illegal remuneration and with whom the defendant entered into illegal financial relationships, have referred large volumes of patients with health care coverage from Medicare, Medicaid, TriCare and other federally sponsored health care programs to SMC, GRH and HMC, which, in turn, have submitted and caused to be submitted claims for payment to the federally sponsored health care programs in the hundreds of thousands, if not millions, of dollars for services provided to these referred patients. These claims included HCFA Form - 1450s or their electronic equivalent. The defendant, HCA, through SMC, GRH and HMC, has presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent. Under the FCA, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent because defendant HCA was not entitled to be paid for them. The defendant was not entitled to be paid for these claims because (a) it was ineligible for reimbursement under the Stark Statute's express prohibition on Medicare billing and Medicare reimbursement for services that are the product of a referral from a physician with whom HCA has an illegal financial relationship and (b) HCA forfeited the right to bill the government healthcare programs for items and services by paying remuneration to Drs. Taleghani, Boskind, Thomas and Fruin intending that remuneration to induce patient referrals in violation of the AKS.

43.    In addition to the knowing submission of false claims in violation of the FCA, the defendant has also knowingly made, used, or caused to be made or used, false records or statements (i.e. the false certifications and representations on the HCFA Form 1450s or their electronic equivalents) to get false or fraudulent claims paid or approved by the United States in violation of the FCA.

-16-

44. By virtue of the false or fraudulent claims knowingly made, used, or caused to be made or used by the defendant and the false records or false statements knowingly made or caused to be made by the defendant to get such false claims paid or approved, the United States has suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## VIII.

## FIFTH CLAIM FOR VIOLATION OF THE TENNESSEE
## MEDICAID FALSE CLAIMS ACT AGAINST HCA

45. Plaintiffs repeat and reallege paragraphs 1 through 13 and 36 through 44 as if fully set forth herein.

46. Since at least January 2008, Drs. Taleghani, Boskind, Thomas and Fruin, to whom the defendant has provided illegal remuneration and with whom the defendant entered into illegal financial relationships have referred large volumes of patients with health care coverage from Tennessee Medicaid to SMC, GRH and HMC. SMC, GRH and HMC, in turn, have submitted and caused to be submitted claims for payment to the Tennessee Medicaid program in the hundreds of thousands, if not millions of dollars, for services provided to these referred patients.

47. The defendant, HCA, through SMC, GRH and HMC, presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent. Under the Tennessee Medicaid False Claims Act, § 71-5-182, such claims were false and/or fraudulent because defendant HCA was not entitled to be paid for them. The defendant was not entitled to be paid for these claims because HCA forfeited the right to bill any federally sponsored state Medicaid program for items and services by paying remuneration to Drs. Taleghani, Boskind, Thomas and Fruin intending that remuneration to induce patient referrals in violation of the AKS.

48. In addition to the knowing submission of false claims in violation of the TMFCA, the defendant has also knowingly made, used, or caused to be made or used, false records or statements (i.e. the false certifications and representations on Medicaid claim forms or their

-17-

electronic equivalents) to get false or fraudulent Medicaid claims paid or approved in violation of the TMFCA.

49.     By virtue of the false or fraudulent claims knowingly made, used, or caused to be made or used by the defendant and the false records or false statements knowingly made or caused to be made by the defendant to get such false claims paid or approved, the State of Tennessee has suffered damages and therefore is entitled to statutory damages under the TMFCA, to be determined at trial, plus a civil penalty for each violation.

## IX.

## SIXTH CLAIM FOR VIOLATION OF THE FCA
## (31 U.S.C. §§ 3729(a)(1)(A) & (B)) AGAINST HCA

50.     Plaintiffs repeat and reallege paragraphs 1 through 13 as if fully set forth herein.

51.     The main campus of Largo Medical Center (LMC) is located at 201 14th Street, SW, Largo, Florida. LMC is operated by Largo Medical Center, Inc., Florida I.D. # 533776, and HCA d/b/a LMC which are wholly owned and controlled by HCA. LMC is an approved provider of inpatient and outpatient medical service for Medicare, Medicaid, Tricare and other federally sponsored health care programs.

52.     LMC's main campus consists of 18.7 acres consisting of LMC's hospital facility located on the West side of 14th Street, S.W. and an additional parcel of land on the East side of 14th Street, S.W., opposite the hospital which, as of January 2008, included a two-level parking structure.

53.     LMC treats large numbers of patients covered by Medicaid, Medicare, TriCare and other federally sponsored health care programs. By virtue of the terms of HCA's Corporate Integrity Agreement and federal law, at all times herein alleged, LMC knew that it was not permitted to submit claims for payment to Medicare, Medicaid, TriCare or other federally sponsored health care program for services provided to any patient that had been referred by a physician with whom HCA had a financial relationship which did not fall under an exception

-18-

under the Stark Statute and AKS. Yet, beginning in approximately March 2008, HCA provided, and caused others to provide, unlawful remuneration to physicians and surgeons in private practice who were not employed by HCA or any of its various instrumentalities in order to obtain patient referrals; disguised this unlawful remuneration in the form of a real estate leasing arrangement that was neither consistent with fair market value in an arms length transaction nor commercially reasonable even if no referrals were made between the physicians and surgeons. As a result, HCA and its instrumentalities submitted, and caused others to submit, to the federally sponsored health care programs, including Medicare, TriCare and Medicaid, false or fraudulent claims for reimbursement and records in support of such claims for the services LMC rendered to the beneficiaries of such federally sponsored health care programs who had been referred to LMC by the physicians and surgeons who were receiving the unlawful remuneration from HCA and its instrumentalities in violation of the Stark Statute and the AKS.

54. Diagnostic Clinic Medical Group, P.A., (DC) is a physician owned Florida Corporation, I.D. # P95000023879. DC physicians refer patients, including patients insured by Medicare, Medicaid, Tricare and other federally sponsored health care programs, to LMC. DC was previously located in a medical office building at 1551 West Bay Drive, Largo, Florida, on a parcel which adjoins the North side of the LMC campus, for most of its 40 year existence.

55. In or about April 2005, DC owner/physicians entered into a joint venture arrangement (hereinafter "joint venture") with The Greenfield Group, Inc., ("Greenfield") which is located at 2300 Glades Road, Suite 100E, Boca Raton, Florida. Greenfield is a real estate brokerage that develops, manages and leases medical office buildings. The purpose of the joint venture between the DC owner/physicians and Greenfield was to obtain a long term favorable lease from HCA of the undeveloped portion of the parcel of land on the East side of 14th Street, S.W., opposite the hospital, and build on it a new medical office building proximate to LMC which was adjacent to LMC's existing two-level parking structure. Based on information and belief, plaintiff herein alleges that the DC owner/physicians and Greenfield jointly formed the entities MMP Equity, LLC , and MMP Partners, LLLP, ("MMP") to carry out the purposes of the joint venture.

56. The joint venture engaged in negotiations with HCAR/LMC (HCA) to obtain a favorable long term lease for the land. However, the proposed square footage of the joint

-19-

venture's new medical office building required at least 620 parking spaces to comply with the City of Largo's zoning intensity requirements. This was far more than the number of spaces in HCA's adjacent two-level parking structure. Normally, if the negotiations between MMP and HCA had been conducted at arm's length, the zoning requirements would have required MMP to lease additional land area for an expanded parking area beyond the land area upon which DC's medical office building was proposed to be built and pay the cost of constructing the required additional parking spaces or reduce the square footage of the proposed medical office building to include additional parking on the leased land area.

57.     In fact, the lease terms that HCA planned to give to the DC owners/physicians through MMP, their proxy, were not reached in a manner consistent with arm's length negotiation and they did not reflect fair market value. The terms included the grant by HCA of an extraordinarily unusual concession to the referring DC owner/physicians. HCA planned to dramatically expand the existing adjacent two-level parking structure to benefit DC's medical office building at a substantial cost to HCA estimated in the millions of dollars and to conceal this gratuity in a carefully orchestrated series of complicated real estate transactions.

58.     On or about February 8, 2008, LMC filed a Notice of Commencement with the Pinellas County Clerk that it was beginning construction on an expansion of its existing two-level parking structure on the East side of 14th Street SW. Over the course of the next several months, HCA expanded the two-level parking structure into a four-level parking structure and added an adjoining four-level structure. As a result, the parking facility was more or less quadrupled in size and now contains 1,000 parking spaces and three elevators. It was built by HCA within two inches of DC's planned medical office building to facilitate direct access into the medical office building from the parking facility.

59.     One month later, on March 7, 2008, HCA finalized a 99 year ground lease with MMP for 24,800 square feet of the undeveloped land on the East side of 14th Street SW adjoining the two-story parking structure to be consumed entirely by DC's medical office building with no part of the ground lease site allocated to parking. The terms of the ground lease transaction limited the use of the land to the construction, maintenance and operation of a medical office building of no more than 150,000 rentable square feet to be used and occupied as medical offices

-20-

for licensed physicians and contained an easement that granted MMP a "non-exclusive" right to use HCAR/LMC's adjoining parking structure. It further provided that HCAR/LMC "may" alter the parking facilities so long as the sum of the number of parking spaces available for use by MMP, after alteration, is equal to not less than the number of parking spaces necessary to comply with all applicable governmental requirements required for the medical office building to be located on the undeveloped land leased by MMP. Plaintiff is informed and believes and herein alleges that MMP and its owner/physicians have never constructed necessary parking facilities sufficient to accommodate the medical office building, that such parking facilities were entirely constructed by HCA at its own expense on HCA land adjacent to the leased land and that the language of the Declaration of Covenants, Restrictions And Easements was deceptively constructed to conceal that HCA had agreed to entirely pay for DC's parking facilities and was in the process of paying for the entire cost of the parking facilities for DC's medical office building. Because the existing two-level parking structure was insufficient to accommodate the number of parking spaces necessary for the size of the planned medical office building to be built by MMP on the undeveloped parcel MMP leased from HCA for the medical office building, HCA knew, that as part of the real estate transaction, that it would be building at its own expense an expanded multi-million dollar parking structure for the overwhelming benefit of the referring DC owner/physicians. HCA's multi-million dollar expansion of the parking structure for the benefit of MMP and the referring DC owner/physicians constitutes unlawful remuneration in violation of the AKS and the Stark Statute.

60.     On March 7, 2008, the same day that MMP and HCA had entered into the 99 year ground lease, MMP entered into a 20 year short form lease with DC beginning 90 days after substantial completion of the medical office building. A Notice of Commencement of Construction of the medical office building was filed by MMP with the Pinellas County Clerk on May 1, 2008. The construction of the expanded parking structure and the adjacent medical office building were both completed by the end of 2009. DC moved into the medical office building and its patients and staff began parking in the newly expanded parking structure in early 2010.

61.     Since at least January 2008, the DC owners/physicians, to whom the defendant has provided illegal remuneration and with whom the defendant entered into an illegal financial relationship have referred large volumes of patients with health care coverage from Medicare,

-21-

Medicaid, Tricare and other federally sponsored health care programs to LMC which, in turn, has submitted and caused to be submitted claims for payment to the federally sponsored health care programs in the hundreds of thousands, if not millions of dollars, for services provided to these referred patients.

62.     The defendant, HCA, through LMC, presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent. Under the False Claims Act, such claims were false and/or fraudulent because defendant HCA was not entitled to be paid for them. The defendant was not entitled to be paid for these claims because HCA forfeited the right to bill any federally sponsored health care program for items and services by paying remuneration to the DC owners/physicians intending that remuneration to induce patient referrals in violation of the AKS.

63.     In addition to the knowing submission of false claims in violation of the False Claims Act, the defendant has also knowingly made, used, or caused to be made or used, false records or statements (i.e. the false certifications and representations on claim forms or their electronic equivalents) which are material to the false or fraudulent claims paid or approved in violation of the False Claims Act.

64.     By virtue of the false or fraudulent claims knowingly made, used, or caused to be made or used by the defendant and the false records or false statements knowingly made or caused to be made by the defendant which are material to the false claims that were paid or approved, the United States has suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

# X.

## SEVENTH CLAIM FOR VIOLATION OF THE
## FLORIDA FALSE CLAIMS ACT

64.     Plaintiffs repeat and reallege paragraphs 1 through 13 and 51-63 as if fully set forth herein.

-22-

65.     Since at least January 2008, the DC owners/physicians, to whom the defendant has provided illegal remuneration and with whom the defendant entered into an illegal financial relationship have referred large volumes of patients with health care coverage from Florida Medicaid to LMC which, in turn, has submitted and caused to be submitted claims for payment to Florida Medicaid in the hundreds of thousands, if not millions of dollars, for services provided to these referred patients.

66.     The defendant, HCA, through LMC, presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent. Under the Florida False Claims Act, Stat. Ann. §68.081 *et seq.*, such claims were false and/or fraudulent because defendant HCA was not entitled to be paid for them. The defendant was not entitled to be paid for these claims because HCA forfeited the right to bill any federally sponsored health care program for items and services by paying remuneration to the DC owners/physicians intending that remuneration to induce patient referrals in violation of the AKS.

67.     In addition to the knowing submission of false claims in violation of the FFCA the defendant has also knowingly made, used, or caused to be made or used, false records or statements (i.e. the false certifications and representations on claim forms or their electronic equivalents) to get false or fraudulent claims paid or approved in violation of the FFCA.

68.     By virtue of the false or fraudulent claims knowingly made, used, or caused to be made or used by the defendant and the false records or false statements knowingly made or caused to be made by the defendant to get false claims paid or approved, the State of Florida has suffered damages and therefore is entitled to statutory damages under the FFCA, to be determined at trial, plus a civil penalty for each violation.

## PRAYER

WHEREFORE, *Qui Tam* Plaintiff Thomas Bingham prays as follows:

A.     Against the defendant, treble damages and civil penalties up to the maximum permitted by law, for the maximum *qui tam* percentage share allowed by law and for attorney's fees, costs and reasonable expenses; and

B.     For any and all other relief to which the plaintiffs may be entitled.

## JURY DEMAND

Plaintiffs request trial by jury.

Dated: May 27, 2010

Phillip E. Benson, CA Bar #97420
(*Pro Hac Vice*)
WARREN ■ BENSON Law Group
620 Newport Center Dr., Suite 1100
Newport Beach, CA 92660
Tel.: 949-721-6636; Fax: 952-955-5177
philbenson@warrenbensonlaw.com

Attorneys for *Qui Tam* Plaintiff
Thomas Bingham

-24-